**SAN ANTONIO WATER COMPANY, a corporation, Plaintiff,**

v.

**R. A. RIDDELL, District Director of Internal Revenue, Defendant.**

No. 65–422.

United States District Court
C. D. California.

June 4, 1968.

Thomas H. McPeters and Surr & Hellyer, San Bernardino, Cal., for plaintiff.

Wm. Matthew Byrne, Jr., U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Chief, Tax Division, Robert T. Jones, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

HAUK, District Judge.

This is an action brought against the District Director of Internal Revenue, Los Angeles District, by a non-profit mutual water company for refund of $50,967.21 in Federal corporate income taxes which, it is alleged, were erroneously and illegally assessed and collected by the Government and overpaid by the taxpayer water company for calendar year 1961.

Jurisdiction is vested in the Court by virtue of 26 U.S.C.A. § 7422, 28 U.S.C.A. § 1340 and 28 U.S.C.A. § 1346(a) (1). Venue is properly laid in this Court under the provisions of 28 U.S.C.A. § 1402.

Having considered all of the evidence, both oral and documentary, the contentions and arguments of the parties and the respective points and authorities relied upon by them, the Court makes its Decision, Findings of Fact and Conclusions of Law, as follows:

## DECISION

San Antonio Water Company (hereinafter "water company") seeks a refund of Federal corporate income tax assessed against, and collected from, it for calendar year 1961, as follows:

| Tax | Interest | Total |
|---|---|---|
| $43,468.84 | $7,498.37 | $50,967.21 |

The issues and contentions involved here are identical with those dealt with by this Court in Bear Valley Mutual Water Company v. R. A. Riddell, 283 F. Supp. 949 (C.D.Cal. 1968). Nothing is to be gained by repeating what the Court stated in its written Decision in that case. Suffice it to say that the issues and contentions involved here have been resolved as indicated in the Findings of Fact and Conclusions of Law in accordance with the written Decision rendered and filed in that case. The factual differences are manifest.

The Court now makes its formal Findings of Fact and Conclusions of Law, as follows:

## FINDINGS OF FACT

### 1.

This is an action for recovery of income tax assessed against and collected from San Antonio Water Company (herein called "water company") for calendar year 1961, as follows:

| Tax | Interest | Total |
|---|---|---|
| $43,468.84 | $7,498.37 | $50,967.21 |

The Complaint for Refund of Income Taxes Erroneously Collected was filed on March 17, 1965. The Answer was filed on July 19, 1965.

2.

Federal jurisdiction is invoked upon the ground that Robert A. Riddell, District Director of Internal Revenue, Los Angeles District, acting by and through his duly authorized delegates, assessed and collected income tax from the water company as indicated in Paragraph 1 hereof, which the water company alleges was not due. Jurisdiction is conferred on this Court by 26 U.S.C. § 7422, 28 U.S.C. § 1340 and 28 U.S.C. § 1346(a)(1). Venue is properly laid in this Court under the provisions of 28 U.S.C.A. § 1402.

3.

San Antonio Water Company was organized and incorporated under the laws of California on September 12, 1882. The original articles of incorporation provided:

"Second. That the purposes for which it is formed are to acquire by appropriation, purchase, or otherwise, water, water rights, water privileges and right of way in the Counties of Los Angeles and San Bernardino and to furnish lease or sell the same for irrigation, milling, manufacturing and other purposes.

To own, hold, construct and maintain canals, ditches and all structures, lands, easements and rights appertaining thereto for the purpose of taking and conveying water for the purposes herein mentioned, to owners of lots and blocks in the village of Ontario and to stockholders in this corporation and none others."

The original articles of incorporation remained in force from the date of incorporation to July 23, 1901, when they were amended to empower the water company to construct electrical power plants to generate electricity for pumping water. No other changes were made.

As amended, the articles of incorporation remained in force from July 23, 1901 to March 10, 1919, when they were substantially rewritten. Pertinent portions of the articles of incorporation, as amended on March 10, 1919, provided:

"Second:—That the purposes for which it is formed are:

(a) To furnish, supply and distribute water at cost to and for its stockholders only, for domestic, irrigation and all other useful purposes, in proportion to the number of shares of such stock held by them respectively.

\* \* \* \* \* \*

Nothing herein contained shall authorize or be construed to permit said corporation to carry on the business of any public utility, anything to the contrary herein contained notwithstanding, nor shall anything herein contained authorize or be construed as permitting the accumulation of any funds by said corporation for the purpose of pecuniary profit; it being the intent and purpose of this corporation to be mutual and without profit to any of its stockholders, and all of its water system shall be used, operated and maintained without any compensation whatever accruing to said corporation therefor; provided that nothing herein contained shall abridge or impair the power of this corporation to levy assessments for any of the purposes mentioned in Section 331 of the Civil Code of the State of California, or to issue bonds, anything herein contained to the contrary notwithstanding."

As thus amended, the articles of incorporation remained in force from March 10, 1919 to February 19, 1932, when the third amended articles of incorporation which have been in force since that time without further change or modification were adopted. These third amended articles of incorporation provide:

"SECOND: That the purposes for which it is formed are:

To furnish, supply and distribute water at cost, to and for its stockholders, for domestic, irrigation and all

other useful purposes, in proportion to the number of shares of such stock held by them respectively.

In carrying out said purposes, it shall have power, among other things:

\*    \*    \*    \*    \*    \*

All of the foregoing purposes and powers are subject to the express limitation and condition that the corporation is not formed and does not exist with a view to pecuniary gain or profit to its shareholders, nor does it contemplate pecuniary gain or profit to its shareholders, nor shall the corporation carry on the business of any public utility, nor accumulate funds for the purpose of pecuniary profit; and at all times the corporation shall conduct its business and operate as a non-profit cooperative corporation for the exclusive use and benefit of its shareholders and without any profit accruing to them from the business of the corporation."

\*    \*    \*    \*    \*    \*

"EIGHTH: Authority is expressly conferred upon the corporation to levy assessments upon and against all of the shares issued by the corporation; and the Board of Directors shall have power, by majority vote of its members; to levy assessments upon all the issued shares of the corporation, at such time or times, and from time to time, and in such amounts, as shall to them appear necessary or expedient; (provided, the assessment levied at any particular time shall be for the same amount against each share then issued and outstanding); and each assessment shall be a lien upon the shares assessed, from the time of the adoption of the resolution levying such assessment until paid, and each shareholder shall be personally liable to the corporation for the amount of each assessment levied against the shares, standing upon the books of the corporation in the name of such shareholder at the time of the adoption of the resolution levying such assessment, which amount may be recovered from the shareholder, by suit or personal action.

In event of non-payment of any assessments, the corporation may, at its option, either (a) sell and/or forfeit the shares against which the assessment was levied, in the manner now, or as may be hereafter provided by the laws of the State of California; or (b) by majority vote of its Board of Directors, collect the assessment by personal action and suit against the shareholder personally liable therefor."

4.

The capital of the water company consisted of $15,000, representing subscriptions by the 5 incorporators of 150 shares of stock at a par value of $100 per shares.

5.

The water company determines its income and files its income tax return according to the accrual method of accounting and upon a calendar year basis.

6.

During the year 1961, and as more fully set forth in the income tax return filed and elsewhere herein, the revenue of the water company was derived from assessments levied with respect to its outstanding stock, sales of water to stockholders, realized gain on sale of real estate, interest, gravel lease payments, sale of surplus water, sewer and water connections, and other sources, such as charges for relocating pipelines and abandonment of easements.

7.

The water company filed a U. S. Corporation Income Tax Return (Form 1120) for the year 1961 reflecting adjusted gross income in the amount of $233,559.70, deductions in the amount of $384,563.96, and therefore, a net loss in the amount of $151,004.26.

8.

During 1961, the issued and outstanding stock of the water company consisted of 6,389 shares of common stock. The shares are owned by approximately 653 separate shareholders, including the cities of Upland (who owns 1,066 shares)

and Ontario (who owns 269 shares). The shares are not appurtenant to the land served by water company or to any other lands. Each shareholder is entitled to receive a certain amount of water per share as determined from time to time by the board of directors of the water company.

Only 1 shareholder, owning 35 shares, does not own land within the service area of the water company.

## 9.

The board of directors determined that each shareholder would be entitled to receive distribution of 6 miner's inches of water per month (.2380 acre foot) for each share of stock owned throughout the year 1961.

The water delivered to each shareholder was measured by means of meters. Each shareholder received a monthly statement for the water distributed to him based upon the amount of water distributed during the month and the then prevailing unit charge for water.

The unit charge for water distributed was 40 cents per day inch ($10.08 per acre foot) from January 1, 1961 to August 1, 1961, and 60 cents per day inch ($15.12 per acre foot) from August 1, 1961 through December 31, 1961.

The water company asserted that the charge made for water was equivalent to its fair market value. The Government asserted that it was not and requested the Court to proceed upon the assumption that it was not, leaving the factual question of the fair market value of the water distributed to the shareholders for later determination. In view of the Court's determination of the issues, it is not necessary to take evidence with respect to or make a determination of the fair market value of the water distributed to the shareholders.

## 10.

The water company was not obligated by its articles of incorporation, or otherwise, to charge its shareholders an amount equal to the fair market value of the water distributed to them.

Likewise, the water company was not obligated by its articles of incorporation, or otherwise, to charge its shareholders an amount sufficient to offset or defray the cost of producing, gathering, furnishing and distributing water to them.

The water company is entitled and obligated by its articles of incorporation to produce, gather, furnish, and distribute water to its shareholders not at "actual cost" but "net cost". That is, it is entitled and obligated to pool its income and expenses from all sources in an effort to furnish water to its shareholders at the lowest possible cost. This is, and has been historically, the prevailing and accepted mode of operation for a mutual water company.

To have charged its shareholders the amount said by the Government to be the fair market value of the water distributed to them—$384,563.96—would have resulted in a profit of $100,308.18 in derogation of the articles of incorporation of the water company.

## 11.

The water company was not organized and has not been operated pursuant to a plan or scheme of tax avoidance. Its organization and mode of operation is, and has been historically, that prevailing and accepted for a non-profit mutual water company.

## 12.

During the irrigation season, only a few shareholders fail to take their full entitlement of water, but during the non-irrigation season the full entitlement is rarely taken.

Sometimes, a shareholder who does not need his full entitlement of water will "sell" the water to which he is entitled to another shareholder and will designate the irrigation system of the purchasing shareholder as the point of delivery of the water to which he is entitled.

The water company delivers the water to which a shareholder is entitled at any point in the distribution system designated by the shareholder.

During 1961, the holders of 377.25 shares sold their water entitlements to other shareholders for the duration of the irrigation season. The prevailing charge was $35 for the water entitlement incident to each share.

During 1961, some shareholders sold their water entitlements to other shareholders upon a monthly basis. The prevailing charge was $4.50 for the water entitlement incident to each share per month. The equivalent of the water entitlements incident to 352.48 shares for 1 month were sold in this manner.

In addition to paying the prevailing charge for the water entitlement incident to the selling shareholders, whether the water entitlements were purchased for the season or a month, the purchasing shareholders paid the water company the prevailing unit charge for water actually distributed to them in accordance with the water entitlements purchased by them. The selling shareholders, not the purchasing shareholders, paid the assessments levied with respect to the stock.

The shareholders refer to the selling and purchasing of water entitlements as "renting shares".

The service area of the water company comprises approximately 10,000 acres located in the vicinity of Upland and Ontario, California.

### 13.

During 1961, the water company distributed 11,484 acre feet of water to its shareholders as follows:

(a) The water company distributed 7,799 acre feet of untreated water to 226 shareholders (owning a total of 4,648 shares of stock) for use in irrigating the 4,400 acres of citrus groves owned by them.

(b) The water company distributed 900 acre feet of untreated water to the city of Upland, California (who owned 1,066 shares of stock). The city treated the water distributed to it in and with its own facilities and then distributed the treated water, along with water obtained from other sources, to its residents for domestic purposes.

(c) The water company distributed 2,181 acre feet of untreated water to 4 shareholders (owning a total of 241 shares of stock) for use in their commercial rock crushing and gravel processing operations.

(d) The water company distributed 604 acre feet of treated water to 400 shareholders (owning a total of 165 shares) for domestic purposes. The only difference between the treated water distributed to these shareholders and the untreated water distributed to other shareholders was that the treated water had been diverted through 2 chlorination units prior to distribution. No other treatment was accorded the water.

Some shareholders did not use or "sell" their entitlements during 1961, including the city of Ontario (who owned 269 shares of stock).

The water company received $127,895.-97 from its shareholders during 1961 for the water distributed to them in accordance with their stock entitlements.

The average unit charge for water delivered to shareholders during 1961 was $11.13 per acre foot (being $127,895.97 divided by 11,484).

### 14.

During 1961, the water company sold "surplus water" to various persons and entities for miscellaneous purposes. Receipts from this source amounted to $1,161.30.

During 1961, domestic consumers used 91.32 acre feet of water in excess of the amount to which they were entitled by virtue of their stock ownership. The water company charged a penalty rate for such water of 10 cents per 100 cubic feet ($45.60 per acre foot). The water company received $4,164.28 from this source. Any domestic consumer who frequently uses more water than he is entitled to use by virtue of his stock ownership is required by the water company to purchase additional stock from other shareholders.

The aggregate amount received by the water company from all sources during 1961 from sales of "surplus water" was $5,355.55.

based upon the amount distributed to them and the then prevailing unit charge in all of the years since 1932 and in most of the years from 1882 to 1932.

### 15.

The water company has made charges for water distributed to its shareholders

The unit charge for water in each of the years since 1932 is as follows:

| Year | Rate Per Day Inch | Rate Per Acre Foot |
|---|---|---|
| 1932 | $ .24 | $ 6.05 |
| 1933 | .28 | 7.06 |
| 1934 | .35 | 8.82 |
| 1935 | .24 | 6.05 |
| 1936 through April, 1937 | .30 | 7.56 |
| May through December, 1937 | .18 | 4.54 |
| 1938 | .15 | 3.78 |
| 1939 | .21 | 5.29 |
| 1940 | .20 | 5.04 |
| 1941 | .17 | 4.29 |
| 1942 | .19 | 4.79 |
| 1943 | .15 | 3.78 |
| 1944 | .20 | 5.04 |
| 1945 | .17 | 4.29 |
| 1946 | .22 | 5.55 |
| 1947 | .24 | 6.05 |
| 1948 through April 1949 | .30 | 7.56 |
| May through December 1949 | .34 | 8.57 |
| 1950 through April 1951 | .35 | 8.82 |
| May through December 1951 | .40 | 10.08 |
| 1952 | .40 | 10.08 |
| 1953 | .40 | 10.08 |
| 1954 | .40 | 10.08 |
| 1955 | .40 | 10.08 |
| 1956 through April 1957 | .40 | 10.08 |
| May through December 1957 | .50 | 12.60 |
| January through July 1958 | .50 | 12.60 |
| August through December 1958 | .40 | 10.08 |
| 1959 | .40 | 10.08 |
| 1960 through August 1961 | .40 | 10.08 |
| September through December 1961 | .60 | 15.12 |

#### 16.

The shareholders receiving delivery of water were not obligated to pay any amount in excess of the amount determined by the board of directors of the water company for the water actually received by them.

#### 17.

On January 16, 1961, the board of directors levied an assessment of $3 against each share of issued and outstanding stock. The Notice of Assessment received by each shareholder stated that the purpose of the assessment was "capital construction".

On July 17, 1961, the board of directors levied an assessment of $5 against each share of issued and outstanding stock. The Notice of Assessment received by each shareholder stated that the purpose of the assessment was "capital construction".

The assessments were levied without regard to the amount of water used, if any, with respect to each share.

The assessments were paid in full and produced revenue of $51,112.

The water company made capital expenditures of $53,798.26 during 1961.

Nevertheless, the proceeds of the assessments were not segregated from other proceeds received by the water company and were received by the water company free of any restrictions upon use.

The intention of the board of directors when levying each of the assessments as indicated was to provide revenue to offset the deficit in operating expenses for the year (after there was first applied to the operating expenses for the year all revenue from non-water sources) and to make capital expenditures. A portion of each assessment levied was intended to be a contribution to the capital of the water company, and, a portion of each assessment levied was intended to be a charge for water produced, gathered, furnished and distributed to the shareholders.

The water company should be permitted to exclude from its gross income an amount determined by the following formula:

Shareholder Assessments divided by Total of

Shareholder Assessments plus Non-Water

Net Income and multiplied by Capital

Expenditure equals Amount to be Excluded.

The remaining balance of the assessment revenue should be included in gross income.

The assessment revenue to be excluded from and included in the gross income of the water company for the year 1961 under this formula is as follows:

| Excluded | Included |
|---|---|
| $ 18,388.00 | $ 32,724.00 |

#### 18.

The net income from non-water sources during 1961 was $98,403.18, being the aggregate amount of gross income received by the water company less the amounts designated on its U. S. Corporation Income Tax Return (Form 1120) as "water sales to stockholders", "sale of surplus water" and "sewer and water connections". The evidence affords no basis for allocating any portion of the expenses of the water company to the

revenue from non-water sources. Due to this circumstance, non-water net income is in fact non-water gross income in this particular year.

**19.**

In past years, the water company has levied assessments with regard to its outstanding stock as follows:

| Date | | Assessment Number | Assessment Per Share |
|------|------|---------|---------|
| July 15 | 1884 | 1 | $ .30 |
| December 13 | 1884 | 2 | .30 |
| July 13 | 1885 | 3 | .20 |
| February 1 | 1886 | 4 | .30 |
| October 27 | 1886 | 5 | .20 |
| February 21 | 1887 | 6 | .40 |
| October 27 | 1887 | 7 | .30 |
| April 19 | 1888 | 8 | .40 |
| July 17 | 1888 | 9 | .30 |
| March 13 | 1889 | 10 | .40 |
| September 30 | 1889 | 11 | .30 |
| March 17 | 1890 | 12 | .40 |
| September 22 | 1890 | 13 | .30 |
| March 16 | 1891 | 14 | .40 |
| September 21 | 1891 | 15 | .50 |
| May 16 | 1892 | 16 | .50 |
| September 26 | 1892 | 17 | .35 |
| March 20 | 1893 | 18 | .50 |
| August 21 | 1893 | 19 | .50 |
| January 6 | 1894 | 20 | .50 |
| July 17 | 1894 | 21 | .50 |
| December 17 | 1894 | 22 | .50 |
| April 18 | 1895 | 23 | .65 |
| September 30 | 1895 | 24 | .50 |
| February 17 | 1896 | 25 | 3.00 |
| September 26 | 1896 | 26 | 1.00 |
| March 31 | 1897 | 27 | 2.00 |
| October 6 | 1897 | 28 | 2.00 |
| March 25 | 1898 | 29 | 2.00 |
| October 5 | 1898 | 30 | 2.00 |
| May 16 | 1899 | 31 | 5.00 |
| October 3 | 1899 | 32 | 5.00 |
| March 16 | 1900 | 33 | 5.00 |
| September 18 | 1900 | 34 | 5.00 |
| February 5 | 1901 | 35 | 5.00 |
| June 18 | 1901 | 36 | 5.00 |
| February 18 | 1902 | 37 | 5.00 |
| October 21 | 1902 | 38 | 5.00 |
| January 13 | 1903 | 39 | 10.00 |
| April 21 | 1903 | 40 | 10.00 |
| August 19 | 1903 | 41 | 5.00 |
| January 5 | 1904 | 42 | 10.00 |
| May 7 | 1904 | 43 | 10.00 |
| September 20 | 1904 | 44 | 5.00 |
| January 17 | 1905 | 45 | 10.00 |
| June 27 | 1905 | 46 | 5.00 |

| Date | | Assessment Number | Assessment Per Share |
|------|------|------|------|
| September 18 | 1905 | 47 | 5.00 |
| January 18 | 1906 | 48 | 5.00 |
| May 18 | 1906 | 49 | 10.00 |
| October 13 | 1906 | 50 | 5.00 |
| January 18 | 1907 | 51 | 5.00 |
| May 18 | 1907 | 52 | 5.00 |
| September 18 | 1907 | 53 | 5.00 |
| December 23 | 1907 | 54 | 5.00 |
| March 21 | 1908 | 55 | 10.00 |
| July 18 | 1908 | 56 | 5.00 |
| September 18 | 1908 | 57 | 5.00 |
| January 18 | 1909 | 58 | 5.00 |
| April 19 | 1909 | 59 | 5.00 |
| June 18 | 1909 | 60 | 5.00 |
| September 18 | 1909 | 61 | 5.00 |
| February 18 | 1910 | 62 | 5.00 |
| June 18 | 1910 | 63 | 5.00 |
| September 19 | 1910 | 64 | 5.00 |
| February 18 | 1911 | 65 | 5.00 |
| June 19 | 1911 | 66 | 5.00 |
| September 18 | 1911 | 67 | 6.00 |
| March 18 | 1912 | 68 | 5.00 |
| June 18 | 1912 | 69 | 5.00 |
| September 18 | 1912 | 70 | 2.50 |
| September 18 | 1913 | 71 | 6.00 |
| March 18 | 1914 | 72 | 5.00 |
| June 18 | 1914 | 73 | 5.00 |
| September 18 | 1914 | 74 | 5.00 |
| March 18 | 1915 | 75 | 5.00 |
| September 18 | 1915 | 76 | 5.00 |
| April 18 | 1916 | 77 | 5.00 |
| September 18 | 1916 | 78 | 5.00 |
| March 18 | 1917 | 79 | 5.00 |
| September 18 | 1917 | 80 | 5.00 |
| March 18 | 1918 | 81 | 5.00 |
| March 18 | 1919 | 82 | 5.00 |
| August 18 | 1919 | 83 | 5.00 |
| March 18 | 1920 | 84 | 5.00 |
| June 18 | 1920 | 85 | 5.00 |
| September 18 | 1920 | 86 | 5.00 |
| March 18 | 1921 | 87 | 5.00 |
| July 18 | 1921 | 88 | 5.00 |
| September 18 | 1921 | 89 | 5.00 |
| March 18 | 1922 | 90 | 5.00 |
| September 18 | 1922 | 91 | 5.00 |
| March 19 | 1923 | 92 | 5.00 |
| September 18 | 1923 | 93 | 5.00 |
| March 18 | 1924 | 94 | 5.00 |
| May 19 | 1924 | 95 | 5.00 |
| March 17 | 1925 | 96 | 5.00 |
| June 18 | 1925 | 97 | 5.00 |

| Date | | Assessment Number | Assessment Per Share |
|---|---|---|---|
| September 18 | 1925 | 98 | 5.00 |
| January 18 | 1926 | 99 | 5.00 |
| April 19 | 1926 | 100 | 5.00 |
| July 19 | 1926 | 101 | 5.00 |
| October 18 | 1926 | 102 | 5.00 |
| March 18 | 1927 | 103 | 5.00 |
| June 27 | 1927 | 104 | 5.00 |
| September 19 | 1927 | 105 | 5.00 |
| March 19 | 1928 | 106 | 5.00 |
| June 16 | 1928 | 107 | 5.00 |
| September 18 | 1928 | 108 | 5.00 |
| November 18 | 1928 | 109 | 5.00 |
| March 18 | 1929 | 110 | 5.00 |
| June 17 | 1929 | 111 | 5.00 |
| September 17 | 1929 | 112 | 5.00 |
| November 18 | 1929 | 113 | 5.00 |
| March 17 | 1930 | 114 | 5.00 |
| June 16 | 1930 | 115 | 5.00 |
| September 18 | 1930 | 116 | 5.00 |
| November 17 | 1930 | 117 | 5.00 |
| March 16 | 1931 | 118 | 5.00 |
| June 15 | 1931 | 119 | 5.00 |
| September 21 | 1931 | 120 | 5.00 |
| November 16 | 1931 | 121 | 5.00 |
| March 21 | 1932 | 122 | 5.00 |
| December 19 | 1932 | 123 | 5.00 |
| August 21 | 1933 | 124 | 5.00 |
| December 18 | 1933 | 125 | 1.00 |
| August 20 | 1934 | 126 | 5.00 |
| December 17 | 1934 | 127 | 2.75 |
| August 19 | 1935 | 128 | 5.00 |
| December 16 | 1935 | 129 | 3.50 |
| August 17 | 1936 | 130 | 5.00 |
| December 17 | 1936 | 131 | 2.00 |
| August 23 | 1937 | 132 | 3.50 |
| December 20 | 1937 | 133 | 3.25 |
| August 15 | 1938 | 134 | 3.50 |
| December 19 | 1938 | 135 | 2.75 |
| August 21 | 1939 | 136 | 4.00 |
| December 18 | 1939 | 137 | 2.00 |
| August 19 | 1940 | 138 | 3.50 |
| December 19 | 1940 | 139 | 2.25 |
| August 18 | 1941 | 140 | 3.00 |
| December 15 | 1941 | 141 | 2.00 |
| August 17 | 1942 | 142 | 3.00 |
| December 21 | 1942 | 143 | 1.50 |
| August 18 | 1943 | 144 | 5.00 |
| December 20 | 1943 | 145 | 2.50 |
| August 21 | 1944 | 146 | 5.00 |
| November 20 | 1944 | 147 | 5.00 |
| August 20 | 1945 | 148 | 5.00 |

| Date | | Assessment Number | Assessment Per Share |
|------|------|------|------|
| December 17 | 1945 | 149 | 5.00 |
| August 19 | 1946 | 150 | 3.00 |
| December 11 | 1946 | 151 | 5.00 |
| August 15 | 1947 | 152 | 5.00 |
| December 15 | 1947 | 153 | 3.00 |
| July 19 | 1948 | 154 | 5.00 |
| December 20 | 1948 | 155 | 5.00 |
| July 18 | 1949 | 156 | 5.00 |
| January 16 | 1950 | 157 | 2.50 |
| July 17 | 1950 | 158 | 5.00 |
| January 15 | 1951 | 159 | 5.00 |
| July 16 | 1951 | 160 | 5.00 |
| January 21 | 1952 | 161 | 5.00 |
| July 21 | 1952 | 162 | 5.00 |
| January 19 | 1953 | 163 | 5.00 |
| July 20 | 1953 | 164 | 5.00 |
| January 18 | 1954 | 165 | 5.00 |
| July 19 | 1954 | 166 | 5.00 |
| January 17 | 1955 | 167 | 5.00 |
| July 18 | 1955 | 168 | 5.00 |
| January 16 | 1956 | 169 | 5.00 |
| July 16 | 1956 | 170 | 5.00 |
| January 21 | 1957 | 171 | 5.00 |
| July 15 | 1957 | 172 | 5.00 |
| January 20 | 1958 | 173 | 5.00 |
| July 21 | 1958 | 174 | 5.00 |
| January 16 | 1959 | 175 | 5.00 |
| July 20 | 1959 | 176 | 5.00 |
| February 15 | 1960 | 177 | 3.00 |
| July 18 | 1960 | 178 | 5.00 |
| January 16 | 1961 | 179 | 3.00 |
| July 17 | 1961 | 180 | 5.00 |

The assessments have been levied with respect to all outstanding and issued shares and without regard to the amount of water actually used, if any, with respect to each share.

20.

The initial assets of the water company consisted of water rights in the surface flow of the water flowing in and through San Antonio Canyon and San Antonio Creek. The water rights were obtained from George Chaffey, Jr. and William B. Chaffey, brothers, in exchange for 160 shares of stock.

During succeeding years, additional water rights were obtained from the Chaffey brothers in exchange for stock of the water company.

21.

San Antonio Creek originates in the San Gabriel Mountains (in San Bernardino County), flows through the Angeles National Forest, down the San Antonio Canyon and empties upon the plains northeast of the cities of Pomona and Claremont (in Los Angeles County) and north of the cities of Ontario and Upland (in San Bernardino County).

The water course of San Antonio Creek follows the line of lowest elevation in San Antonio Canyon. Rainwater, spring-water and melting snow flow from the land in and constituting San Antonio Canyon. The land purchased constituted the only privately owned land in and around San Antonio Canyon. The surrounding land constituted the Angeles National Forest.

### 22.

The water flowing in and through Cucamonga Canyon is diverted from its natural flow by means of a "diversion dam" onto "spreading grounds". The purpose of diverting the water is to keep it from following its natural water course and, instead, cause it to sink into the Cucamonga Basin, an underground water basin.

By means of ditches and pipelines, water from San Antonio Canyon is transported to the "spreading grounds" for "spreading" in the Cucamonga Basin.

The water company extracts water from the Cucamonga Basin by means of wells and pumps.

The land constituting the "spreading grounds" was acquired during the 1890's and early 1900's and, over the years, the water company has constructed dikes (59 of them), ditches and basins on it for use in "spreading".

The land constituting the Cucamonga "spreading grounds" is, and has been since sometime in the 1920's, subject to an easement for flood control purposes.

Over the years, the various governmental agencies responsible for flood control have constructed dams, dikes, ditches and basins on the "spreading grounds".

### 23.

Some of the water flowing through San Antonio Canyon is transported onto "spreading grounds" overlying the Claremont Basin, an underground water basin.

The water company extracts water from the Claremont Basin by means of wells and pumps.

The land constituting the "spreading grounds" was acquired in 1953 as a result of a merger with Euclid Water Company, a mutual water company. A substantial portion of the shareholders of Euclid Water Company were shareholders of the water company. The assets of Euclid Water Company were transferred to the water company, and water company stock was distributed to the shareholders of Euclid Water Company.

The land constituting the Claremont "spreading grounds" is, and has been since sometime in the 1920's, subject to an easement for flood control purposes.

Over the years, the various governmental agencies responsible for flood control have constructed dams, dikes, ditches and basins on the "spreading grounds".

### 24.

During 1961, the water company received payments from 4 commercial rock crushing and gravel companies as follows:

| | |
|---|---:|
| Base Rock Company | $ 5,900.00 |
| Canyon Rock Products | 8,900.00 |
| Mountain Rock Products | 32,401.80 |
| Central Rock Products Corporation | 17,900.00 |
| | $ 65,101.80 |

These amounts were paid to the water company under and in accordance with leases entered into with each of the companies.

(These amounts are included in the figure reflected as income received from "rents" on the U. S. Corporation Income Tax Return (Form 1120) filed for calendar year 1961.)

### 25.

The lands leased by the rock crushing and gravel companies are located in the "spreading grounds" of the water company. Rock and gravel are removed by the companies. The number, location, depth and slant of the excavations are determined by the Chief Engineer for the San Bernardino County Flood Control

District. The removal of rock and gravel results in large pits that receive run off water and cause it to sink into the underground basins.

## 26.

During 1961, the 4 rock crushing and gravel companies owned an aggregate of 241 shares of stock of the water company and received distribution of 2,181 acre feet of untreated water for use in their operations.

## 27.

A substantial number of the shareholders and all of the directors, except one director who owned no shares, claimed deductions for the amounts paid by them in response to the assessments levied with respect to their stock in computing their respective taxable income for federal income tax purposes for 1961.

## 28.

The expenses reflected in the U. S. Corporation Income Tax Return (Form 1120) filed by the water company for 1961 are dedutible as ordinary and necessary expenses of conducting a business.

## 29.

By letter dated December 23, 1964, the Internal Revenue Service notified the water company that after examination it proposed to increase taxable income to the amount of $100,308.18.

On January 29, 1965, the Internal Revenue Services assessed a deficiency in income tax for the calendar year 1961 in the amount of $50,967.21 (being tax of $43,468.84 and interest of $7,498.37), which was collected from an advance payment made by the water company on January 21, 1965.

On January 21, 1965, a Claim (Form 843) was filed with the Internal Revenue Service with respect to the tax assessed and collected for calendar year 1961.

By letter dated March 11, 1965, the Internal Revenue Service notified the water company that its Claim (Form 843) for calendar year 1961 has been disallowed in full, and thereafter, the within Complaint for Refund of Income Taxes Erroneously Collected was filed against R. A. Riddell, District Director of Internal Revenue.

## 30.

The following Conclusions of Law, insofar as they may be deemed Findings of Fact, are so found by this Court to be true in all respects. From the foregoing facts, the Court concludes that:

## CONCLUSIONS OF LAW

### I.

The water company was organized and has continuously operated as a non-profit mutual water company to furnish to its shareholders at cost.

### II.

The water company was not obligated by its articles of incorporation or otherwise to charge its shareholders either (a) the fair market value or (b) the cost of the water produced, gathered, furnished and distributed to them during the tax year involved.

### III.

The shareholders were not obligated to pay any amount for the water produced, gathered, furnished and distributed to them in excess of the amount determined by the board of directors to be due therefor.

### IV.

The water company was entitled and obligated to pool its revenue and expenses from all sources in an effort to furnish water to its shareholders at the lowest possible cost.

### V.

The water company was not organized and has not been operated pursuant to a plan or scheme of tax avoidance. Its organization and mode of operation is, and has been historically, that prevailing and accepted for a non-profit mutual water company.

### VI.

The water company was not entitled to receive from its shareholders for the water produced, gathered, furnished and

distributed to them any amount in excess of the amount determined by the board of directors to be due therefor.

### VII.

 Assuming the water company distributed water to its shareholders for less than its (a) fair market value or (b) cost, it did not realize gross income in an amount equal to the difference between either the (a) fair market value or (b) cost and the amount actually received from them therefor.

### VIII.

 The expenses reflected in the U. S. Corporation Income Tax Return (Form 1120) filed by the water company for 1961 are deductible as ordinary and necessary expenses of conducting a business. There is no basis for disallowing as deductions an aggregate amount of unspecified expenses equal to the excess of the cost of producing, gathering, furnishing and distributing water to the shareholders over the revenue received from them therefor. Each item of expense must be examined and measured against the legal standard for deductibility.

### IX.

The amounts received by the water company from its shareholders in payment of the assessments levied with respect to their shares are partially includible in income and partially excludable from income as follows:

| Excluded | Included |
| --- | --- |
| $ 18,368.00 | $ 32,724.00 |

The amounts excluded from income constitute capital contributions.

The amounts included in income constitute charges for water.

### X.

 There is no basis for either including in or excluding from the income of the water company the entire aggregate amounts received by the water company from its shareholders in payment of the assessments levied with respect to their shares during the tax year involved.

### XI.

The water company has overpaid the income tax for 1961 in the amount of $50,967.21 and is entitled to a refund thereof, plus interest according to law.

### XII.

Any Conclusions of Law deemed to be contained in the Findings of Fact are incorporated herein by reference.

Let judgment be entered accordingly.