BUCKEYE COUNTRYMARK, INC., SUCCESSOR TO FAYETTE LANDMARK, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 29412–87.        Filed November 9, 1994.

*Arthur E. Bryan, Jr., George W. Benson,* and *David J. Duez,* for petitioner.

*James E. Kagy,* for respondent.

WHALEN, *Judge:* Respondent determined a deficiency of $26,272 in the Federal income tax of Fayette Landmark, Inc., for its fiscal year ending August 31, 1977. The sole issue for decision is whether section 277 applies to Fayette, a nonexempt cooperative subject to the provisions of subchapter T of the Internal Revenue Code (sections 1381–1388), and prohibits it from carrying back to fiscal year 1977 losses realized during fiscal year 1980 from transactions with its

stockholders. (Unless otherwise indicated, all section references are to the Internal Revenue Code as amended.)

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and the exhibits attached thereto are incorporated herein by this reference.

Petitioner was formed after the years at issue, on September 3, 1986, as a result of the consolidation of Fayette, the taxpayer, with another cooperative, Green Landmark, Inc. Petitioner is Fayette's legal successor. At the time petitioner filed the subject petition, its principal place of business was Xenia, Ohio.

Fayette was incorporated on February 3, 1934, as a farmers' marketing and purchasing cooperative under sections 1729.01 to 1729.28, inclusive, of the Ohio Revised Code (Anderson 1992). It was organized principally to supply petroleum products to farmers in Fayette County, Ohio. For Federal tax purposes, it qualified as an exempt farmers' cooperative under section 521 and its predecessors.

In June 1975, Fayette's articles of incorporation and code of bylaws were amended to restrict the payment of patronage refunds to patrons owning shares of class A or class C common stock. By taking this action, Fayette voluntarily relinquished its status as an exempt section 521 cooperative for Federal tax purposes and became a so-called nonexempt cooperative. It took this action to avoid the record keeping necessary to pay patronage dividends to all patrons, as required of an exempt cooperative, rather than just to shareholders.

During the period at issue, September 1, 1976, through August 31, 1980, Fayette's stated purpose according to its amended articles of incorporation was "to engage on a nonprofit cooperative basis for the mutual benefit of its members in any activity in connection with the conducting of a general agricultural, marketing and purchasing business in any and all of its phases". In furtherance of this purpose, Fayette engaged in the grain and agricultural supplies businesses, described below. It operated primarily in Fayette County, Ohio, and its principal office was located in Washington Court House, the largest town in that county. It competed

directly with a number of noncooperative or commercial companies, and it operated in a manner similar to those competitors.

Under its amended articles of incorporation and amended code of bylaws, adopted in June of 1975, Fayette was authorized to issue three classes of common stock, classes A, B, and C, and one class of preferred stock. Class A common stock was Fayette's only class of voting stock. Ownership of class A common stock was limited to "persons engaged in the production of agricultural products for the market, including the lessees and tenants of land used for the production of such products, and any lessors and landlords who receive as rent, all or any part, of the crops raised on the leased premises" and certain producer-owned cooperative agricultural associations. No other persons were eligible to hold class A common stock, and such shares were not transferable, except with the consent of the board of directors. Each holder of class A common stock was entitled to only one vote irrespective of the number of shares owned. Class A common shareholders are referred to as "members" in Fayette's amended code of bylaws. There were 1,989.4 shares of class A common stock outstanding as of August 31, 1977, and 1,691.5 shares outstanding as of August 31, 1980.

According to Fayette's amended articles of incorporation, class B common stock could be issued only to members (i.e., class A shareholders) in payment of, or in satisfaction of patronage refunds to which such member was entitled. During fiscal years 1977 and 1980, no shares of class B common stock were outstanding.

Class C common stock was identical in all other respects to class A common stock, but its holders were not entitled to vote, except as otherwise provided by State law. Persons not meeting the eligibility standards to hold class A common stock, as set out in the articles, were permitted to purchase class C common stock. Thus, class C common stock was held by patrons of Fayette, other than producers of agricultural products. Fayette's amended code of bylaws referred to class C stockholders as "associate members". Fayette had 24 holders of class C common stock as of August 31, 1977, and 27 holders as of August 31, 1980.

· Fayette's preferred stock was nonvoting and was the only class of stock with shares outstanding upon which "divi-

dends" could be paid. Dividends on shares of preferred stock could not exceed 8 percent of its par value in any year. Fayette had $324,125 of preferred stock outstanding at August 31, 1977, and $283,925 outstanding at August 31, 1980.

Holders of class A and C common stock were entitled to receive patronage refunds. Under Fayette's amended articles and bylaws, patronage refunds were to be paid annually in an amount equal to Fayette's patronage earnings ("net savings or margins" arising out of the business transacted with patrons who hold class A common and class C common) remaining after payment of dividends on preferred stock and provision for necessary reserves. Fayette accounted for the earnings from its grain business and its supplies business separately, and paid patronage refunds to patrons of each business who were shareholders. In the case of the grain business, patronage refunds were based upon the bushels of grain purchased from each shareholder. In the case of the supplies business, patronage refunds were based upon the dollar amount of supply sales made to each shareholder.

Patronage refunds were required to be paid after the close of each fiscal year, either in cash or in written notices of allocation. Fayette used qualified written notices of allocation in the form of certificates of ownership and letters of advice which informed the recipient how much had been allocated to the recipient on Fayette's books as the noncash portion of the refund. Holders of the notices had consented, within the meaning of section 1388(c), to include patronage refunds paid in the form of written notices of allocation in income at their stated dollar amount. They were not entitled to interest or dividends on such amount. Payments with respect to such notices were made in accordance with the provisions of Fayette's articles and bylaws. The aggregate stated dollar amount of Fayette's outstanding letters of advice as of August 31, 1977, was $728,670. As of August 31, 1980, it was $743,511.

Upon liquidation, dissolution, or winding up of the affairs of Fayette, any residual assets, after the payment of all debts and the retirement of stock and letters of advice, at par or stated dollar value, were to be shared on a patronage basis.

Fayette's grain business involved the purchase, storage, handling, and sale of grains, principally corn and soybeans.

It operated two grain elevators for storage of the grains it purchased.

Fayette purchased grains from producers at competitive market prices. All sellers were offered the same terms and conditions, whether or not they were shareholders of Fayette, except that sellers who were shareholders were entitled to patronage refunds at the close of the fiscal year. Most of the grain purchased by Fayette was from producers who owned class A or C common stock. Shareholders were, however, under no obligation to sell grain to Fayette; they were free to sell to other companies, and most would do so if they could obtain a better price from other companies. For fiscal year 1977, 99.2 percent of the total value of the grain purchased by Fayette was purchased from shareholders. For fiscal year 1980, it was 90.5 percent.

Fayette's supplies business involved the sale of agricultural supplies, principally fertilizer, petroleum products, feed, seed, herbicides, and pesticides, to producers on a cooperative basis. Fayette operated three feed mills, three fertilizer plants, a bulk petroleum facility, and two small farm supply stores. The three fertilizer plants stored and blended fertilizer products to the specifications required by the producers. Fayette tested soil for its patrons and would assist them in determining the best mineral and fertilizer blends for their fields. It owned and rented to customers implements used to spread fertilizer. The bulk petroleum facility in Washington Court House sold petroleum products including gasoline, diesel fuel, and heating oil, to producers for farm use. The two small farm supply stores sold farm supply related items such as shovels, hoses, rakes, and gloves.

Fayette generally sold supplies at the prevailing market prices, similar to those charged by its competitors. It offered supplies to all persons at the same prices and on the same terms and conditions, whether or not they were shareholders, except that persons who were shareholders were entitled to patronage refunds. Most of the supplies sold by Fayette were sold to persons who owned class A or C common stock. For fiscal year 1977, 89.6 percent of the supplies business was done with shareholders. For fiscal year 1980, it was 74.9 percent.

During the period in issue, September 1, 1976, through August 31, 1980, Fayette operated on a cooperative basis

with its shareholders within the meaning of section 1381(a)(2) and was subject to the provisions of subchapter T (sections 1381–1388) of the Code. For fiscal years ending August 31, 1977, and August 31, 1980, Fayette filed Federal income tax returns on IRS Form 1120, U.S. Corporation Income Tax Return, and computed its taxable income under the accrual method of accounting.

For fiscal year 1977, Fayette earned and reported for Federal income tax purposes taxable income of $99,541, after having deducted $295,590 as patronage refunds. Of its taxable income for the year, $85,275 was attributable to business transacted with or for its class A and class C stockholders and $14,266 was attributable to business with nonstockholders. For fiscal year 1980, Fayette incurred a net operating loss in the amount of $62,712 that it reported on its Federal income tax return for the year. Of that amount, $62,624 was attributable to business transacted with or for Fayette's class A and class C stockholders and the remainder, $88, was attributable to business with nonstockholders. Fayette's taxable income for 1977 and its loss for 1980, as reported on its Federal income tax returns, are summarized as follows:

| Fiscal year | Taxable income / (loss) | Transactions with or for stockholders | Transactions with or for nonstockholders |
|---|---|---|---|
| 1977 | $99,541 | $85,275 | $14,266 |
| 1980 | (62,712) | (62,624) | (88) |

On July 10, 1981, Fayette filed an amended Federal income tax return on Form 1120X for fiscal year 1977, on which it deducted the total loss for 1980 and, based on that deduction, claimed refund of a portion of the Federal income tax paid for fiscal year 1977. On September 24, 1981, the Internal Revenue Service issued a check to Fayette in the amount of $30,004.62, consisting of a refund of tax in the amount of $26,668 and interest of $3,336.62.

Subsequently, respondent mailed a notice of deficiency to Fayette, in which respondent determined that the loss which Fayette had deducted on its amended return for fiscal year 1977 is not allowable as a net operating loss carryback under section 172 because, according to the notice of deficiency:

Section 277(a) of the Internal Revenue Code does not allow the carrybacks [sic] of membership losses incurred by an organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation.

Respondent determined that $61,887 of the net operating loss carryback is attributable to business which Fayette transacted with or for shareholders. Based thereon, respondent computed a deficiency of $26,272.

The parties have stipulated that $62,624 of the net operating loss, rather than $61,887, is attributable to the business with class A or class C common shareholders. The parties have also stipulated that respondent claims an increase in the deficiency in income tax for Fayette's 1977 fiscal year in the amount of $363.

## OPINION

The sole issue for decision in this case is whether section 277 applies to Fayette, a nonexempt cooperative subject to subchapter T of the Internal Revenue Code. This issue governs the treatment of the loss of $62,712 realized by Fayette during fiscal year 1980. Fayette treated the entire loss as a net operating loss within the meaning of section 172(c) and carried it back to fiscal year 1977, the third preceding taxable year, by filing an amended return for that year on which Fayette deducted the loss as a net operating loss carryback, pursuant to section 172(b)(1)(A).

As mentioned above, $62,624 of the 1980 loss arose from transactions with its class A and class C shareholders, and the remainder, $88, arose from transactions with nonshareholders. For fiscal year 1977, Fayette had reported taxable income from transactions with shareholders of $85,275 that had not been distributed as patronage refunds, and Fayette had reported taxable income from transactions with nonshareholders of $14,266. Thus, there was sufficient taxable income in each category to fully absorb the 1980 loss.

Respondent does not question the existence, amount, or source of the loss reported on Fayette's return for fiscal year 1980 in the amount of $62,712. Nor does respondent question the treatment of the portion of the loss from transactions with nonshareholders, $88, as a net operating loss carryback to fiscal year 1977, as prescribed by section 172(b)(1)(A).

Respondent's position is that Fayette is subject to section 277, which prohibits it from carrying back the portion of the 1980 loss which arose from transactions with shareholders, $62,624.

Three conditions must be satisfied for section 277 to apply to an entity: (1) It must be "a social club or other membership organization"; (2) it must be "operated primarily to furnish services or goods to members"; and (3) it must be an entity "which is not exempt from taxation". Sec. 277(a); *Armour-Dial Men's Club, Inc. v. Commissioner*, 77 T.C. 1, 7 (1981), affd. 708 F.2d 1287 (7th Cir. 1983). The parties agree that, as a nonexempt cooperative, Fayette was not exempt from taxation, and, thus, they agree that the third condition is met. They disagree about the other two conditions.

Respondent argues that subchapter T cooperatives, such as Fayette, are "membership organizations" within the meaning of section 277(a), and are operated primarily to furnish services or goods to their members. Thus, according to respondent, Fayette meets all of the conditions set forth above, and its loss from transactions with shareholders constitutes a deduction "attributable to furnishing services, insurance, goods, or other items of value to members". As such, the loss cannot be carried back but must be treated as "paid or incurred in the succeeding taxable year." Sec. 277(a).

Petitioner argues that subchapter T cooperatives, such as Fayette, are neither membership organizations nor primarily operated to furnish services or goods to members, and, accordingly, Fayette does not meet either the first or second condition set forth in section 277. Petitioner's principal argument is that section 277 is not intended to apply to cooperatives, like Fayette, which are entitled under section 172 to carry back net operating losses, subject only to the limitations set forth in subchapter T.

*An Overview of the Taxation of Nonexempt Cooperatives Under Subchapter T*

In order to analyze this issue and the positions of the parties, it is necessary to understand the regime under which nonexempt cooperatives are taxed. In general, a cooperative is a type of business organization that operates at cost for the mutual benefit of its patrons. It is characterized: (1) By

the fact that the capital contributed to the cooperative is subordinated to the rights of the members of the cooperative both as regards control over the cooperative enterprise and as regards ownership of the pecuniary benefits arising therefrom; (2) by the fact that the cooperative is democratically controlled by its members; and (3) by the fact that the net earnings of the cooperative enterprise (i.e., excess of operating revenues derived from business with patrons over the costs incurred in generating those revenues) are vested in the cooperative's patrons and are returned or allocated to each patron in proportion to the patron's participation in producing those net earnings. See *Puget Sound Plywood, Inc. v. Commissioner,* 44 T.C. 305, 308–309 (1965).

For Federal income tax purposes, cooperatives are distinguished from other business organizations by the fact that they are eligible for certain special deductions set forth in subchapter T. See *Illinois Grain Corp. v. Commissioner,* 87 T.C. 435, 449 (1986). For discussions of the history of subchapter T, see *Farm Serv. Co-op. v. Commissioner,* 619 F.2d 718, 722–726 (8th Cir. 1980), revg. and remanding 70 T.C. 145 (1978); *St. Louis Bank for Co-ops.v. United States,* 224 Ct. Cl. 289, 624 F.2d 1041, 1043–1045 (1980); *Independent Co-op. Milk Producers Association v. Commissioner,* 76 T.C. 1001, 1012–1014 (1981); *Farmers Co-op. Co. v. Birmingham,* 86 F. Supp. 201 (N.D. Iowa 1949).

Subchapter T applies to exempt farmers' cooperatives described in section 521 and "any corporation operating on a cooperative basis". Sec. 1381(a). The first of the special deductions provided by subchapter T, sec. 1382(b), permits all cooperatives that are covered thereunder to deduct "patronage dividends", defined in section 1388(a), and "per-unit retain allocations", defined in section 1388(f). In general, a patronage dividend is an amount that is allocated or paid to a patron out of the net earnings of the cooperative from business done with or for its patrons and that is based upon the quantity or value of business done with or for the patron, under a preexisting obligation to pay such amount. Sec. 1388(a). A per-unit retain allocation is an amount allocated or paid to a patron with respect to products marketed for the patron that is fixed without regard to the net earnings of the cooperative. Sec. 1388(f).

The other special deductions provided by subchapter T are available only to farmers' cooperatives described in section 521. Sec. 1382(c). These include a deduction for dividends paid on the cooperative's capital stock, sec. 1382(c)(1), and a deduction for amounts paid to patrons on a patronage basis with respect to the cooperative's earnings derived from sources other than patronage, sec. 1382(c)(2).

The special deductions provided by subchapter T permit farmers' cooperatives described in section 521 to entirely offset gross income for the taxable year, and, hence, cooperatives described in section 521 are referred to as "exempt cooperatives". To qualify as an exempt cooperative, the cooperative must be a farmers', fruit growers', or like association, and it must be organized and operated on a cooperative basis either as a "marketing cooperative" or as a "purchasing cooperative". Sec. 521(a) and (b)(1). A marketing cooperative markets or sells to the general public products produced by its members or other producers and returns to them the proceeds of the sales, less marketing expenses, on a proportionate basis, such as on the basis of the value or quantity of the products supplied by each member or other producer. Sec. 521(b)(1)(A); sec. 1.521–1(a)(1), Income Tax Regs. A purchasing cooperative buys supplies and equipment to be used or consumed by its members or other persons, and sells such supplies and equipment to them at actual cost, plus necessary expenses. Sec. 521(b)(1)(B).

Exempt cooperatives are required to treat all patrons the same, whether or not the patron is a member of the cooperative. Sec. 1.521–1(a)(1), Income Tax Regs. However, the amount of business that an exempt cooperative can transact with nonmembers is limited. In general, it must transact 50 percent or more of its business with members and, in the case of a purchasing cooperative, the value of supplies and equipment purchased "for persons who are neither members nor producers does not exceed 15 percent of the value of all its purchases." Sec. 521(b)(4).

Cooperatives other than those described in section 521, such as petitioner, that are entitled to deduct only patronage dividends and per-unit retain allocations under section 1382(b), remain taxable on nonpatronage income and are referred to as "nonexempt" or "taxable cooperatives". Unlike exempt cooperatives, subchapter T does not prohibit

nonexempt cooperatives from dealing with nonmembers on a for-profit basis, nor does it limit the amount of business a nonexempt cooperative can do with nonmembers. See *Conway County Farmers Association v. United States,* 588 F.2d 592 (8th Cir. 1978).

The term "patron" is defined in section 1.1388–1(e), Income Tax Regs., as follows:

The term "patron" includes any person with whom or for whom the cooperative association does business on a cooperative basis, whether a member or a nonmember of the cooperative association, and whether an individual, a trust, estate, partnership, company, corporation, or cooperative association.

The term "member" is defined in section 1.1388–1(c)(3)(ii)(c), Income Tax Regs., as follows:

For purposes of this subdivision the term "member" means a person who is entitled to participate in the management of the cooperative organization.

The regulations under section 521 set forth the following definition of the term "member":

Anyone who shares in the profits of a farmers' cooperative marketing association, and is entitled to participate in the management of the association, must be regarded as a member of such association within the meaning of section 521. [Sec. 1.521–1(a)(3), Income Tax Regs.]

For purposes of the special deduction provided by section 1382(b), the term "patronage dividend" is defined by section 1388(a) as follows:

SEC. 1388(a). PATRONAGE DIVIDEND.—For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies—

    (1) on the basis of quantity or value of business done with or for such patron,

    (2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

    (3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

It is clear from the above that in order for an amount to qualify as a patronage dividend, it must have been "determined by reference to the net earnings of the organization from business done with or for its patrons." Sec. 1388(a)(3). In this opinion, we refer to income that is derived from business done with or for patrons of the cooperative as "patronage income". Cf. sec. 1388(j)(4). Patronage dividends cannot be paid "out of earnings other than from business done with or for patrons". Sec. 1388(a). We refer to income that is derived other than from business done with or for patrons as "nonpatronage income".

In effect, every cooperative subject to subchapter T, whether an exempt or a nonexempt cooperative, is entitled to deduct patronage income to the extent that it pays or allocates such income to its patrons as a patronage dividend. Sec. 1382(b). Thus, patronage income is subject to tax only once, at the cooperative level or the patron level, depending upon whether the cooperative distributes such income to its patrons. This treatment reflects the notion that the cooperative is merely an agent for its patrons and that the money returned to patrons as patronage dividends in fact always belonged to them. *Farm Serv. Co-op. v. Commissioner,* 619 F.2d at 722; see *Des Moines County Farm Serv. Co. v. United States,* 324 F. Supp. 1216, 1219 (S.D. Iowa 1971), affd. per curiam 448 F.2d 776 (8th Cir. 1971). Patronage dividends are considered rebates on purchases or deferred payments on sales, allocated or distributed pursuant to a preexisting obligation of the cooperative, and, as such, do not constitute taxable income to the cooperative. *Farmers Co-op. Co. v. Birmingham,* 86 F. Supp. at 213–214.

The treatment of nonpatronage income, on the other hand, differs depending upon whether it is earned by an exempt or a nonexempt cooperative. In the case of a nonexempt cooperative, nonpatronage income is fully taxable to the cooperative whether or not distributed and, if the cooperative distributes nonpatronage income to its patrons, it is again taxed to the patrons. *Farm Serv. Co-op. v. Commissioner, supra* at 723. In the case of an exempt cooperative, nonpatronage income, like patronage income, is taxed only once, either at the cooperative level or at the patron level, depending on whether the cooperative distributes the income to its patrons. Sec. 1382(c)(2).

Because of the differences in the tax treatment of patronage income and nonpatronage income, and because of the differences between the treatment of exempt and nonexempt cooperatives, subchapter T requires nonexempt cooperatives to separate patronage from nonpatronage income in computing taxable income. *St. Louis Bank for Co-ops. v. United States,* 624 F.2d at 1044–1045; *Farm Serv. Co-op. v. Commissioner, supra* at 723; *Certified Grocers, Ltd. of Cal. v. Commissioner,* 88 T.C. 238, 246 (1987). This is a fundamental principle of subchapter T.

In effect, subchapter T requires nonexempt cooperatives to separate income and deductions into two categories or baskets, one for patronage income and deductions and one for nonpatronage income and deductions. Subchapter T limits the deduction for patronage dividends to the net income in the first basket, the net patronage income for the taxable year, and in the case of a nonexempt cooperative, subchapter T prohibits the cooperative from computing a patronage dividend with respect to any income in the second basket, nonpatronage income. Secs. 1382(b), 1388(a). We note that the Code expressly permits cooperatives to combine patronage income or loss from different "allocation units", but, in that event, it must provide its patrons with certain information in a written notice. Sec. 1388(j).

Subchapter T prohibits a nonexempt cooperative from increasing the net income in the patronage basket by treating nonpatronage income as patronage income, e.g., *Land O'Lakes, Inc. v. United States,* 514 F.2d 134, 141 (8th Cir. 1975), or by treating patronage expenses as nonpatronage expenses, see *Certified Grocers, Ltd. of Cal. v. Commissioner, supra* at 245–247. Subchapter T also prohibits the netting of patronage losses against nonpatronage income. E.g., *Farm Serv. Co-op. v. Commissioner, supra; Certified Grocers, Ltd. of Cal. v. Commissioner, supra* at 250. For example, a nonexempt cooperative can file a consolidated return under section 1501 with one or more noncooperative corporations, but net patronage losses cannot be used to offset nonpatronage income in the consolidated return. *Certified Grocers, Ltd. of Cal. v. Commissioner, supra* at 250–251. The nonexempt cooperative must separate patronage and nonpatronage income and loss, and the consolidated return can only combine the cooperative's nonpatronage income or

loss with the income or loss of other members of the same affiliated group of corporations that are not cooperatives. *Id.* at 251.

Similarly, a nonexempt cooperative is entitled to deduct net operating losses pursuant to section 172, but it cannot carry net patronage losses over or back under section 172 to offset net nonpatronage income from a different year. See *Farm Serv. Co-op. v. Commissioner, supra* at 728; *Ford-Iroquois FS, Inc. v. Commissioner,* 74 T.C. 1213, 1221 (1980); *Associated Milk Producers, Inc. v. Commissioner,* 68 T.C. 729 (1977). Otherwise, the special deductions which are reserved by subchapter T only for patronage income could be taken against nonpatronage income in violation of subchapter T. See *Certified Grocers, Ltd. of Cal. v. Commissioner, supra* at 250.

We note that our opinions in *Ford-Iroquois FS, Inc. v. Commissioner, supra,* and *Associated Milk Producers, Inc. v. Commissioner, supra,* were specifically mentioned by Congress in formulating the special rules for netting of patronage income and losses set forth in section 1388(j). See S. Rept. 99–146 (1985), 1986–2 C.B. 333, 341. Section 1388(j) became law as part of the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99–272, sec. 13210(a), 100 Stat. 82, 323. The report issued by the Senate Finance Committee in connection with its consideration of that Act states as follows:

> The Tax Court has addressed some of these issues * * *. In *Associated Milk Producers,* 68 T.C. 729 (1977), the IRS asserted that a cooperative was not entitled to carry over a net operating loss deduction where doing so would offset patronage income in a taxable year with losses from a prior year. However, the court held that the carry over was allowed in circumstances that the court considered reasonable for management to offset the income and loss. In *Ford-Iroquois FS, Inc.,* 74 T.C. 1213 (1980), the IRS asserted that a non-exempt cooperative was not entitled to carry over a net operating loss deduction to the extent that losses from prior years' marketing and storage operations would offset patronage income from farm supply operations. However, the court allowed the carryover, noting that there was substantial overlap of the patrons of the two operations and the allocations otherwise were fair. * * * [S. Rept. 99–146, *supra,* 1986–2 C.B. at 341.]

Section 1388(j)(1) confirms the Court's opinions in the above cases by recognizing that cooperatives can utilize a net

operating loss deduction under section 172. It provides as follows:

SEC. 1388(j). SPECIAL RULES FOR THE NETTING OF GAINS AND LOSSES BY COOPERATIVES.—For purposes of this subchapter, in the case of any organization to which part I of this subchapter applies—
(1) OPTIONAL NETTING OF PATRONAGE GAINS AND LOSSES PERMITTED.— The net earnings of such organization may, at its option, be determined by offsetting patronage losses (*including any patronage loss carried to such year*) which are attributable to 1 or more allocation units (whether such units are functional, divisional, departmental, geographic, or otherwise) against patronage earnings of 1 or more other such allocation units. [Emphasis supplied.]

The report of the Senate Finance Committee also makes this clear in the following passage:

The committee intends that these provisions do not affect a cooperative's ability to use net operating loss deductions available under present law. Moreover, the committee intends no inference regarding the treatment under present law of the offsetting of patronage earnings and losses other than patronage losses. Nevertheless, the committee approves of the result in *Farm Service Cooperative v. Comm'r,* 619 F.2d 718 (8th Cir. 1980), which held that a non-exempt cooperative could not offset patronage losses against nonpatronage earnings. [S. Rept. 99–146, *supra,* 1986–2 C.B. at 342.]

Furthermore, the Commissioner's regulations refer to a "net operating loss carryback or carryover" of patronage losses. Sec. 1.1383–1(a)(2), (b)(3), (d) (*Example*), Income Tax Regs.

Deductible patronage dividends can be paid in cash, in a type of scrip referred to as "qualified written notices of allocation", or in property (other than nonqualified scrip). Sec. 1382(b)(1). A "written notice of allocation" is simply a written notice that states the dollar amount allocated to the patron and the portion thereof which constitutes a patronage dividend. Sec. 1388(b). The written notice of allocation is "qualified" if it may be redeemed in cash at any time within 90 days after it is issued or if the distributee has consented to include its stated dollar amount in income, and in either case if it is also part of a patronage dividend of which 20 percent or more is paid in cash. Sec. 1388(c).

A cooperative is not entitled to deduct a nonqualified written notice of allocation paid as a patronage dividend during the payment period for the taxable year in which the patronage occurred, nor is it entitled to deduct a per-unit retain

allocation paid in a nonqualified per-unit retain certificate during the payment period with respect to the taxable year during which the marketing occurred. Sec. 1382(b)(1), (3). However, the cooperative is entitled to deduct the amount of money or property paid to redeem such a nonqualified written notice of allocation or nonqualified per-unit retain certificate. Sec. 1382(b)(2), (4). In fact, if a cooperative is entitled to a deduction under section 1382(b)(2) or (4) for an amount paid to redeem a nonqualified written notice of allocation or a nonqualified per-unit retain certificate, then section 1383(a) provides that the cooperative's tax for the year shall be the lesser of the tax computed with the deduction or the tax computed without the deduction, less the decrease in tax which would have resulted in the prior taxable year or years from treating the written notice of allocation or per-unit retain certificate as qualified.

The reports issued by the congressional committees in connection with the passage of the Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 960, make clear that the purpose of section 1383 is to give cooperatives the benefit of a deduction for the redemption of nonqualified written notices of allocation and nonqualified per-unit retain certificates, even if the cooperative has no taxable income in the year of the redemption. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 484; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 819. The committee reports describe the purpose of this provision as follows:

A deduction also is allowed for nonqualified allocations when they are redeemed in cash or other property (except allocations). If there is no taxable income in the year of the redemption against which to take this deduction for redeemed nonqualified allocations, the cooperative may obtain a credit or refund of the tax it paid in the prior year on the earnings represented by the allocations. This gives the cooperative assurance that the deduction for the redeemed patronage dividend will not be wasted. [H. Rept. 1447, *supra,* 1962–3 C.B. at 484; S. Rept. 1881, *supra,* 1962–3 C.B. at 819.]

The classification of an item of income as patronage or nonpatronage income depends upon the relationship of the activity generating the income to the activities of the cooperative. See, e.g., *Illinois Grain Corp. v. Commissioner,* 87 T.C. at 459. An item of income is patronage income if it is derived from an activity that is:

so closely intertwined and inseparable from the main cooperative effort that it may be properly characterized as directly related to, and inseparable from, the cooperative's principal business activity, and thus can be found to "actually facilitate" the accomplishment of the cooperative's business purpose. * * * [*Id.*]

Nonpatronage income, on the other hand, is defined as income derived from an activity that has "no integral and necessary linkage to the cooperative enterprise". *Id.* Treasury regulations define nonpatronage income as follows:

(2) Definition. As used in this paragraph, the term "income derived from sources other than patronage" means incidental income derived from sources not directly related to the marketing, purchasing, or service activities of the cooperative association. For example, income derived from the lease of premises, from investment in securities, or from the sale or exchange of capital assets, constitutes income derived from sources other than patronage. [Sec. 1.1382–3(c)(2), Income Tax Regs.]

This definition is expressly applicable only to exempt cooperatives, but it is generally applied to nonexempt cooperatives. See, e.g., *CF Indus., Inc. v. Commissioner,* 995 F.2d 101, 102 (7th Cir. 1993), modifying and affg. T.C. Memo. 1991–568; *Cotter & Co. v. United States,* 765 F.2d 1102, 1106 (Fed. Cir. 1985); *Certified Grocers, Ltd. of Cal. v. Commissioner,* 88 T.C. at 244 n.13.

*An Overview of Section 277*

Section 277(a) provides as follows:

In the case of a social club or other membership organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members shall be allowed only to the extent of income derived during such year from members or transactions with members * * *. If for any taxable year such deductions exceed such income, the excess shall be treated as a deduction attributable to furnishing services, insurance, goods, or other items of value to members paid or incurred in the succeeding taxable year. * * *

The issue in this case, whether the term "membership organization", as used in section 277, was intended to include nonexempt cooperatives, has been considered by the U.S. Claims Court in *Landmark, Inc. v. United States,* 25 Cl. Ct. 100 (1992). That court concluded that nonexempt cooperatives are not subject to the requirements of section 277.

This Court has considered section 277 in six prior cases, but we have not decided the issue presented here, whether the term "membership organization" includes nonexempt cooperatives. See *Concord Consumers Housing Co-op. v. Commissioner*, 89 T.C. 105 (1987); *Armour-Dial Men's Club, Inc. v. Commissioner*, 77 T.C. 1 (1981); *Associated Master Barbers & Beauticians of America, Inc. v. Commissioner*, 69 T.C. 53 (1977); *Synanon Church v. Commissioner*, T.C. Memo. 1989–270; *Washington-Oregon Shippers Co-op., Inc. v. Commissioner*, T.C. Memo. 1987–32. In *Farm Serv. Co-op. v. Commissioner, supra,* the Commissioner raised the contention that section 277 prohibited the taxpayer, a nonexempt cooperative, from taking a current deduction for losses sustained in one of its patronage activities. In that case, however, the Commissioner had raised the issue in an amended answer and failed to sustain the burden of proving that section 277 applied to the facts presented. *Farm Serv. Co-op. v. Commissioner*, 70 T.C. at 155–157.

The term "membership organization" is not defined in section 277. Therefore, as we have done each time we have previously considered other aspects of section 277, we turn to the legislative history of section 277 for guidance regarding the meaning of that term. See *Farm Serv. Co-op. v. Commissioner*, 70 T.C. at 155–156; *Concord Consumers Housing Co-op. v. Commissioner, supra* at 116–123; *Armour-Dial Men's Club, Inc. v. Commissioner, supra* at 8; *Associated Master Barbers & Beauticians of America, Inc. v. Commissioner, supra* at 71–74; *Synanon Church v. Commissioner, supra; Washington-Oregon Shippers Co-op., Inc. v. Commissioner*, T.C. Memo. 1987–32 n.13.

Section 277 was added to the Code by the Tax Reform Act of 1969, Pub. L. 91–172, sec. 121(b)(3), 83 Stat. 487, 540. The report of the Senate Finance Committee which was issued in connection with that committee's consideration of section 277 describes the "present law" and "general reason for the change" as follows:

*Present law.*—Certain nonexempt organizations which provide services to members on a nonprofit basis realize investment income, or income from providing services to nonmembers, which is used to defray all or part of the cost of providing services to members. Some courts have held that taxable membership organizations cannot create a "loss" by supplying their members services at less than cost. Other courts have held, instead, that

such a "loss" is permissible, and that the expenses of providing such services at less than cost offset for tax purposes additional income earned by the organization from investments or other activities.

*General reasons for the change.*—In some cases, membership organizations, which also have business or investment income, serve their members at less than cost and offset this book loss against their business or investment income and as a result pay no income tax. In an *important decision,* it was held that a non-exempt water company was not subject to tax when the "losses" in supplying its members water offset its investment income. Other courts have held to the contrary.

[S. Rept. 91–552 (1969), 1969–3 C.B. 423, 471; emphasis supplied.]

The report of the House Ways and Means Committee on section 277 is similar. H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 232.

The "important decision" referred to above is *Anaheim Union Water Co. v. Commissioner,* 321 F.2d 253 (9th Cir. 1963), affg. in part and revg. in part 35 T.C. 1072 (1961). *Synanon Church v. Commissioner, supra.* In *Anaheim Union Water Co. v. Commissioner, supra* at 255–256, the taxpayers were nonexempt mutual water companies that supplied water to shareholders below cost and then deducted the "loss" against certain investment and royalty income. Thus, in *Anaheim,* the taxpayers escaped tax on their investment and royalty income. See also *Adirondack League Club v. Commissioner,* 55 T.C. 796 (1971), affd. per curiam 458 F.2d 506 (2d Cir. 1972); *San Antonio Water Co. v. Riddell,* 285 F. Supp. 297, 300 (C.D. Cal. 1968), affd. sub nom. *Bear Valley Mut. Water Co. v. Riddell,* 427 F.2d 713 (9th Cir. 1970); *Bear Valley Mut. Water Co. v. Riddell,* 283 F. Supp. 949, 952 (C.D. Cal. 1968), affd. 427 F.2d 713 (9th Cir. 1970). There is no suggestion that either of the taxpayers whose cases were consolidated in *Anaheim* operated on a cooperative basis or claimed to be taxed as a cooperative.

Section 277 was enacted concurrently with an extensive revision made to the provisions of the Code concerning the unrelated business income tax. Prior to 1969, social clubs and certain other exempt organizations were not subject to the unrelated business income tax on their investment and nonmember income. Thus, social clubs and these other exempt organizations could realize income from investment or business with nonmembers that was not subject to the income tax, and could use that income to reduce the cost of, or increase the level of, the services or goods they provided

to their members. H. Rept. 91–413 (Part 1), *supra,* 1969–3 C.B. at 231. Congress perceived such practice to be anomalous:

Since the tax exemption for social clubs, for example, is designed to allow individuals to join together to provide recreational or social facilities on a mutual basis, without tax consequences, the tax exemption operates properly only when the sources of income of the organization are limited to receipts from the membership. Under such circumstances, the individual is in substantially the same position as if he had spent his income on pleasure or recreation without the intervening separate organization. However, where the organization receives income from sources outside the membership, such as income from investments, upon which no tax is paid, * * * the exemption is no longer simply allowing individuals to join together for recreation or pleasure without tax consequences. Rather, it is bestowing a substantial additional advantage to the members of the club by allowing tax-free dollars to be used for their personal recreational or pleasure purposes. The extension of the exemption to such investment income is, therefore, a distortion of its purpose. [*Id.*]

Congress corrected this problem in the Tax Reform Act of 1969, by making two major changes to the unrelated business income tax provisions. First, it amended section 511 to extend the unrelated business income tax to virtually all exempt organizations described in section 501(c), including social clubs. Second, it added section 512(a)(3) to the Code, and, in the case of social clubs and certain other exempt organizations, it expanded the definition of "unrelated business income" to include investment income and income from persons who are not members of the exempt organization.

Congress enacted section 277 as a "Related Amendment", in order to backstop the changes made by sections 511 and 512(a)(3). Tax Reform Act of 1969, Pub. L. 91–172, sec. 121(b)(3), 83 Stat. 487, 540. Congress expressed concern that social clubs and other exempt membership organizations which were newly made subject to unrelated business income tax "might attempt to avoid the effect of the changes * * * by giving up their exempt status and deducting the cost of providing services for members against this income." H. Rept. 91–413 (Part 1), *supra,* 1969–3 C.B. at 232.

Section 277 has the same effect on nonexempt organizations as section 512(a)(3) has on exempt organizations. *Concord Consumers Housing Co-op. v. Commissioner,* 89 T.C. at 121. Each section prevents an affected organization from escaping tax on investment income or income from

nonmembers. Staff of Joint Comm. on Taxation, Summary of H.R. 13270, The Tax Reform Act of 1969, at 27, 30 (J. Comm. Print 1969). Thus, section 277 put nonexempt organizations on an equal footing with their exempt counterparts.

The tax policy objective of section 277, as discussed above, is to preclude "a social club or other membership organization" from avoiding tax on its investment or other outside income by conducting its membership activities at a loss. Section 277 accomplishes this objective by requiring, in effect, that the social club or membership organization separate income and deductions into two categories or baskets, one for membership income and deductions and one for nonmembership income and deductions. As to the first basket, section 277 provides that membership deductions (i.e., "deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members") shall be allowed only to the extent of membership income (i.e., "income derived during such year from members or transactions with members"). It further provides that any excess of membership deductions over membership income shall be treated as a membership deduction paid or incurred in the succeeding taxable year. Thus, section 277 prohibits the taxpayer from using excess membership deductions to offset nonmembership income. The effect of this is to prevent taxable membership organizations from avoiding tax on nonmembership income by operating membership activities at a loss and using the loss to offset nonmembership income. *Concord Consumers Housing Co-op. v. Commissioner,* 89 T.C. at 116–117; *Associated Master Barbers & Beauticians of America, Inc. v. Commissioner,* 69 T.C. at 72; see *Armour-Dial Men's Club, Inc. v. Commissioner,* 77 T.C. at 8.

We have considered the scope of the term "income derived * * * from members or transactions with members", which we refer to in this opinion as "membership income", in *Concord Consumers Housing Co-op. v. Commissioner, supra.* The taxpayer in that case was "a federally subsidized, nonprofit corporation organized exclusively to provide housing facilities for persons of low and moderate incomes". *Concord Consumers Housing Co-op. v. Commissioner, supra* at 107. At issue was the interest earned on two reserve accounts and a mortgage escrow account which the taxpayer was required to establish pursuant to regulatory agreements with the Fed-

eral Housing Administration and the State authority. *Id.* at 107 and n.4. Specifically, the issue was whether the interest constituted membership income, as the taxpayer contended, with the result that it could be offset by an equal amount of membership deductions. Otherwise, the interest would be subject to tax and the deductions would be deferred pursuant to section 277.

The Court rejected the taxpayer's argument that the term "membership income" should be defined "to include all income received from sources substantially related to the function of the organization." *Id.* at 117. After reviewing the legislative history of section 277 and its relationship to section 512(a)(3), the Court construed the phrase "income derived during such year from members or transactions with members" narrowly to exclude investment income, even if the income was from sources substantially related to the function of the organization. *Id.* at 121–122. The Court concluded that Congress did not intend taxable organizations described in section 277 to be treated more favorably than tax-exempt organizations described in section 512(a)(3). The interest earned on the escrow and reserve accounts was held to be nonmembership income. *Id.* at 122.

For purposes of this case, it is important to note that the taxpayer in *Concord Consumers Housing Co-op. v. Commissioner, supra,* did not make the argument made by petitioner here, namely that it was a nonexempt cooperative subject to subchapter T and, accordingly, was not subject to section 277. *Id.* at 106–107 n.3. The Court expressly did not consider "the possible interrelationship and full sweep of secs. 216, 277, and subch. T". *Id.* at 107 n.3. Thus, the Court did not consider the applicability of subchapter T in that case. *Id.* at 126 (Körner, J., concurring).

### The Application of Section 277 to Nonexempt Cooperatives

The issue in this case is whether Congress intended to apply section 277 to nonexempt cooperatives which are subject to subchapter T. Our job is to construe the language of the statute "so as to give effect to the intent of Congress." *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 542 (1940). We start with the words of the statute, and we must determine whether the plain meaning of those

words leads to a result that comports with the purpose of the legislation, or whether the plain meaning of the words leads to absurd or futile results, or to an unreasonable result clearly at variance with the policy of the legislation. *Id.* at 543.

In this case, the application of section 277 to nonexempt cooperatives leads "to absurd or futile results" and strongly suggests that Congress did not intend the term "membership organization" to include nonexempt cooperatives. See *id.*; accord *Commissioner v. Brown,* 380 U.S. 563, 570 (1965); *Security Bank Minn. v. Commissioner,* 98 T.C. 33, 39 (1992), affd. 994 F.2d 432 (8th Cir. 1993); *Fehlhaber v. Commissioner,* 94 T.C. 863, 866 (1990), affd. 954 F.2d 653 (11th Cir. 1992). There are four points on which we base that conclusion. First, if membership income means the same thing as patronage income, as respondent contends, then the policy which led Congress to enact section 277 would not be served by applying section 277 to nonexempt cooperatives. On the other hand, if the terms "membership income" and "patronage income" do not mean the same thing, then the application of section 277 to nonexempt cooperatives would conflict with section 1382(b). Second, the application of section 277 to nonexempt cooperatives would render the provisions of section 1383 virtually meaningless. Third, the application of section 277 to nonexempt cooperatives would preclude them from deducting net operating losses under section 172 with respect to patronage activities, contrary to section 1388(j)(1), which makes express reference to "patronage loss carried to such year". Fourth, the application of section 277 to nonexempt cooperatives would mean that nonexempt cooperatives would be subject to rules different from the rules applicable to exempt cooperatives, contrary to express congressional policy.

Before discussing each of those points in greater detail, we note that, as discussed above, nonexempt cooperatives are required by subchapter T to separate income and deductions into patronage and nonpatronage baskets so that any net income in the patronage basket can be distributed to its members and deducted by the nonexempt cooperative under section 1382(b). Patronage income is "the net earnings of the organizations from business done with or for its patrons." Sec. 1388(a)(3). It is that amount which establishes the maxi-

mum amount which may be deducted as a patronage dividend. Sec. 1382(b).

On the other hand, every entity subject to section 277 is required to separate income and deductions into membership and nonmembership baskets so that any net income in the nonmembership basket will be subject to tax without reduction by membership deductions. Membership income is "income derived during such year from members or transactions with members". Sec. 277(a). It is that amount which determines the maximum amount of membership deductions allowed during the year.

In analyzing the application of section 277 to nonexempt cooperatives, a threshold question is whether the cooperative's income and deductions must be divided into two baskets or four. If we assume that membership income is in all cases the same as patronage income, then the change which Congress sought to bring about through the enactment of section 277 in 1969 in the case of "social clubs and other membership organizations" was already embodied in subchapter T as applicable to nonexempt cooperatives. See H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 483–486. Congress enacted section 277 to foreclose the possibility that membership organizations could obtain an unwarranted subsidy of their membership activities by offsetting losses from those activities with investment and other nonmembership income. H. Rept. 91–413 (1969), 1969–3 C.B. 200, 232. However, as discussed above, the rules of subchapter T forbid a nonexempt cooperative from using patronage losses to offset nonpatronage income. E.g., *Farm Serv. Co-op. v. Commissioner,* 619 F.2d 718 (8th Cir. 1980), revg. and remanding 70 T.C. 145 (1978); *Certified Grocers, Ltd. of Cal. v. Commissioner,* 88 T.C. 238 (1987). Thus, irrespective of section 277, a nonexempt cooperative is not entitled to use nonpatronage income to subsidize its patronage activities.

If a nonexempt cooperative chooses to conduct some or all of its patronage activities at a loss, the nonexempt cooperative can minimize or entirely eliminate net patronage income, and it can avoid being taxed on patronage income. See *Farmers' Co-op. Co. v. Birmingham,* 86 F. Supp. at 205–206; Note, 34 Va. L. Rev. 314 (1948); Comment, 50 Harv. L. Rev. 1321 (1937). However, the cooperative could achieve the same result by distributing net patronage income to its mem-

bers as patronage dividends and by deducting the distribution under section 1382(b). Thus, it is difficult to see how there would be any tax avoidance if a nonexempt cooperative conducts its patronage activities at a loss.

In any event, the point is that a nonexempt cooperative can use patronage losses only to reduce patronage income. It cannot use them to "shelter" nonpatronage income. For example, in this case, petitioner could not and is not seeking to use patronage losses to offset nonpatronage income. Petitioner only seeks to carry back patronage losses from 1980 to offset undistributed patronage income earned in 1977. Therefore, if membership income means the same thing as patronage income, the evil which Congress sought to prevent by the enactment of section 277 is not present and could not be present in the case of a nonexempt cooperative, like petitioner.

On the other hand, if membership income and patronage income do not mean the same thing, then a nonexempt cooperative would be required by section 277 to separate income and deductions into membership and nonmembership baskets and would also be required by subchapter T to separate income and deductions into two different baskets for patronage and nonpatronage items. Section 277 contemplates that any net income in the nonmembership basket will be subject to tax at the entity level, whereas section 1382(b) permits a cooperative to avoid tax at the entity level by distributing net income in the patronage basket to patrons. Section 1382(b) allows a cooperative to shift the tax on patronage income to its patrons and, thus, permits in the case of patronage income what section 277 forbids in the case of nonmembership income. If the same income could be classified as nonmembership income for purposes of section 277 and as patronage income for purposes of section 1382(b), then there would be a conflict between section 277(a) and section 1382(b).

This conflict is more than a logical possibility. For example, in *Concord Consumers Housing Co-op. v. Commissioner,* 89 T.C. 105 (1987), we held that the interest income earned by the taxpayer on certain reserve and escrow accounts constituted nonmembership income for purposes of section 277 and was subject to tax at the entity level. However, if the taxpayer in *Concord Consumers Housing Co-op. v. Commis-*

*sioner, supra,* had been a nonexempt cooperative, it is likely that the same income would also have been characterized as patronage income because it was "so closely intertwined and inseparable from the main cooperative effort". *Illinois Grain Corp. v. Commissioner,* 87 T.C. at 459; see *Certified Grocers, Ltd. of Cal. v. Commissioner, supra* at 243 (citing *Illinois Grain Corp. v. Commissioner,* 87 T.C. 435 (1986)); see also *Land O'Lakes, Inc. v. United States,* 675 F.2d 988, 993 (8th Cir. 1982); *Cotter & Co. v. United States,* 765 F.2d 1102, 1110 (Fed. Cir. 1985). Similarly, in *Washington-Oregon Shippers Co-op., Inc. v. Commissioner,* T.C. Memo. 1987–32, the parties stipulated that certain interest income was "'nonmember, patronage-sourced income'", and respondent argued on brief "that income that is admittedly patronage-sourced income, such as the interest from the Tolan and B&W notes, nonetheless is not membership income" for purposes of section 277. *Id.* at n.13. Thus, in both of those cases, the same income would have been treated as nonmembership income for purposes of section 277 and as patronage income for purposes of section 1382(b). In those cases, the concurrent application of sections 277 and 1382(b) would have presented a conflict.

Second, the application of section 277 to nonexempt cooperatives also conflicts with the deduction provided by section 1383(a). As mentioned above, if a written notice of allocation or a per-unit retain allocation is paid in scrip that is not qualified, a nonexempt cooperative is not entitled to take a deduction at the time the scrip is issued but may take a deduction for the money or other property paid in redemption of the scrip. Sec. 1382(b)(2), (4). In that event, section 1383(a) provides that the cooperative's tax savings attributable to such deduction is no less than the tax which would have been saved in the prior taxable year or years if the written notices of allocation or per-unit retain certificates had been qualified. The purpose of section 1383 is to act as a saving provision to assure that the deduction will not be wasted. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 484; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 819. Congress intended section 1383 to apply "If there is no taxable income in the year of the redemption against which to take this deduction for redeemed nonqualified allocations". H. Rept. 1447, *supra,*

1962–3 C.B. at 484; S. Rept. 1881, *supra,* 1962–3 C.B. at 819. However, if there is no taxable income for the year of the redemption against which to take the deduction under section 1382(b)(2) or (4), then section 277 would not "allow" the deduction. In that event, section 1383(a) would be inapplicable because, by its terms, section 1383 applies only "If, under section 1383(b)(2) or (4) * * *, a deduction is allowable". Thus, the application of section 277 to nonexempt cooperatives would prevent section 1383 from applying in precisely the situation Congress intended it to apply and would render that provision virtually meaningless.

The above point assumes that the special deduction for patronage dividends and per-unit retain allocations under section 1382(b) is a membership deduction for purposes of section 277(a), that is, a deduction for the taxable year "attributable to furnishing services, insurance, goods, or other items of value to members". Sec. 277(a); see *Boating Trade Association v. United States,* 35 AFTR 2d 75–1228, 75–1 USTC par. 9398 (S.D. Tex. 1975). This is likely to be the case because, as mentioned earlier, patronage dividends are rebates to patrons who purchase supplies and equipment from a purchasing cooperative or additional sales proceeds to patrons of a marketing cooperative. In either case, patronage dividends are based upon the quantity or value of business done with or for the recipient patron. Sec. 1388(a). Similarly, per-unit retain allocations are allocations to a patron with respect "to products marketed for him." Sec. 1388(f). The cash or property paid to redeem nonqualified written notices of allocation or nonqualified per-unit retain certificates in effect completes the cooperative's transaction with its patrons.

Third, section 277 would preclude nonexempt cooperatives from claiming a net operating loss as defined by section 172(c) with respect to patronage activities and, thus, would conflict with section 1388(j)(1). A net operating loss is "the excess of the deductions allowed by this chapter over the gross income." Sec. 172(c). If section 277 applies to an entity, a loss can never arise for the taxable year in the sense of an excess of membership deductions over membership income because under section 277, membership deductions are "allowed only to the extent of" membership income. Thus, if section 277 applies, the entity would not be eligible to claim

a net operating loss with respect to membership activities. *Associated Master Barbers & Beauticians of America, Inc. v. Commissioner,* 69 T.C. at 73–74.

On the other hand, section 1388(j)(1) expressly allows the netting of patronage losses for the taxable year, "including any patronage loss carried to such year", against patronage income. The legislative history of this provision makes clear that Congress intended cooperatives to be eligible to claim net operating losses. The report of the Senate Finance Committee, issued in connection with the consideration of section 1388(j)(1), specifically approved the opinions of this Court in two cases in which we allowed net operating loss carryover of patronage losses, *Associated Milk Producers, Inc. v. Commissioner,* 68 T.C. 729 (1977), and *Ford-Iroquois FS, Inc. v. Commissioner,* 74 T.C. 1213 (1980). S. Rept. 99–146, *supra,* 1986–2 C.B. at 341. The Senate report also states that the committee intended that the netting provisions not affect a cooperative's ability to use net operating loss deductions available under present law. *Id.,* 1986–2 C.B. at 342. Thus, in effect, section 1388(j)(1) is further evidence that nonexempt cooperatives are not the type of entity that is subject to section 277.

Fourth, section 277 would subject nonexempt cooperatives to rules which are fundamentally different from the rules applicable to exempt cooperatives, contrary to the express congressional policy of placing nonexempt organizations on a par with their tax-exempt counterparts. See *Concord Consumers Housing Co-op. v. Commissioner,* 89 T.C. at 120–121. As we have previously noted, section 277 was enacted as a "Related Amendment" to the changes made in 1969 to the unrelated business income tax and, specifically, to the enactment of section 512(a)(3). *Id.* at 120–122. Congress intended to cause the membership organizations under section 277 to be subject to the same rules as their tax-exempt counterparts. See S. Rept. 91–552 (1969), 1969–3 C.B. 423, 471. However, exempt cooperatives are not organizations described in section 401(a) or 501(c) and, therefore, they are not subject to the tax on unrelated business taxable income. Sec. 511(a)(2). Accordingly, the application of section 277 to nonexempt cooperatives would not place them on a par with exempt cooperatives. It would have the opposite effect.

For example, both exempt and nonexempt cooperatives are entitled to claim deductions under section 1382(b) for patronage dividends and per-unit retain allocations. If section 277 applies to nonexempt cooperatives, it may have the effect of canceling that deduction, in whole or in part, if the cooperative were to sustain a loss with respect to its patronage activities for the year. This happened, for example, in *Certified Grocers, Ltd. of Cal. v. Commissioner,* 88 T.C. at 240, where the cooperative incurred a loss during the taxable year from the issuance of patronage dividends. In that situation, the nonexempt cooperative would be treated entirely differently than an exempt cooperative.

## The Positions of the Parties

Respondent makes three principal arguments in support of her position that section 277 applies to nonexempt cooperatives. First, respondent notes that section 277(b)(1) provides a specific exception for organizations "subject to taxation under subchapter H or L" and, by implication, nonexempt cooperatives fall outside that exception. Second, respondent argues that the legislative history of section 277 supports the view that Congress intended to apply section 277 to nonexempt cooperatives. Third, respondent argues that case law supports the application of section 277 to nonexempt cooperatives.

Respondent also addresses on brief two of the points discussed in the previous section of this opinion. Respondent argues that, in this case, the terms "'patronage' losses and 'membership' losses are synonymous." Respondent also argues that "section 277 is not a bar to the use of the net operating loss, but merely restricts the use of the loss to succeeding years." We shall address these two points before discussing respondent's principal arguments.

As discussed in the previous section of this opinion, the application of section 277 to nonexempt cooperatives presents, as a threshold issue, the question whether the terms "membership income" and "patronage income" are synonymous. If they are, then the rules of subchapter T already provided in the case of nonexempt cooperatives what Congress sought to accomplish by enacting section 277 in the case of membership organizations. If they are not synonymous, then

there is an irreconcilable conflict between section 277(a) and section 1382(b).

Respondent argues that the terms "membership income" and "patronage income" are synonymous but confines that argument to the facts of this case. Indeed, we note, that respondent argued the opposite in *Washington-Oregon Shippers Co-op., Inc. v. Commissioner,* T.C. Memo. 1987–32. Thus, respondent does not address the concerns discussed in the previous section of this opinion, such as why Congress would have imposed section 277 on nonexempt cooperatives when they were already prohibited by subchapter T from sheltering nonmembership income from tax, or how section 277 and section 1382(b) can be applied to income which is both nonmembership and patronage.

Respondent argues that the terms are synonymous because, as applied to this case, the definition of the term "patron" in section 1.1388–1(e), Income Tax Regs., can only include members. Under that definition, a "patron" is "any person with whom or for whom the cooperative association does business on a cooperative basis, whether a member or a nonmember of the cooperative association". Sec. 1.1388–1(e), Income Tax Regs. Respondent notes that petitioner, a nonexempt cooperative, operates on a cooperative basis only with its shareholders; i.e., its members. Therefore, according to respondent, patronage income and membership income mean the same thing in this case.

We agree with respondent that the group of persons who are treated as members under section 277 may be the same persons who are treated as patrons under subchapter T. We also agree that there may be cases in which the term "membership income" and "patronage income" are the same. However, the question is not only how section 277 would apply in this case, but how it would apply to nonexempt cooperatives generally and, in view of the absurd or futile results produced by section 277, as discussed above, whether Congress intended it to apply to nonexempt cooperatives. Respondent does not address that issue.

In our view, membership income and patronage income are different concepts. Congress used different words in formulating them. "Membership income" refers to income "from members or transaction with members". Sec. 277(a). "Patronage income" refers to income "from business done with or for

its patrons." Sec. 1388(a)(3). Therefore, income from business done *for* patrons would not necessarily be "membership income" even though it qualifies as "patronage income." For example, interest income received by an organization from nonmembers does not qualify as "membership income" for purposes of section 277, because it is not received "from members or transaction with members." *Concord Consumers Housing Co-op. v. Commissioner, supra.* However, the same interest income received by a nonexempt cooperative may be classified as "patronage income", if the management of the funds or account bears a close relationship to the overall conduct of its cooperative enterprise. See, e.g., *Cotter & Co. v. United States,* 765 F.2d at 1110; *Land O'Lakes, Inc. v. United States,* 675 F.2d at 993; *St. Louis Bank for Co-ops. v. United States,* 624 F.2d at 1052; *Illinois Grain Corp. v. Commissioner,* 87 T.C. at 460. For purposes of subchapter T, the tax on such income could be shifted to the patrons of the nonexempt cooperative by operation of sections 1382(b) and 1385. For purposes of section 277(a), the same income would be subject to tax at the entity level. This conflict suggests that Congress did not intend section 277 to apply to nonexempt cooperatives.

As also discussed in the previous section of this opinion, section 277 would preclude a nonexempt cooperative from realizing a loss in connection with its patronage activities and would make it impossible for a nonexempt cooperative to claim a net operating loss under section 172, contrary to section 1388(j)(1), which contemplates the netting of patronage losses "including any patronage loss carried to such year". Respondent argues that section 277 has "no applicability" to carryovers "since it prohibits only the carryback of losses resulting from transactions with members." However, respondent does not explain how a nonexempt cooperative could incur any "loss" for the taxable year with respect to transactions with its members, even one that could be carried forward, if section 277 applies. Contrary to respondent's assertion, under section 277 membership deductions for the taxable year are "allowed only to the extent of" membership income and the amount disallowed is "treated as a deduction * * * in the succeeding taxable year." Thus, section 277 would preclude what section 1388(j)(1) expressly permits, in the case of a nonexempt cooperative; i.e., claiming a net

operating loss with respect to patronage activities. This conflict is further evidence that Congress did not intend section 277 to apply to nonexempt cooperatives.

Turning to respondent's principal arguments, respondent first argues that the exception in section 277(b)(1) for organizations "subject to taxation under subchapter H or L" implies, under the doctrine of expressio unius est exclusio alterius, that nonexempt cooperatives are covered by section 277(a). According to respondent, mutual savings banks that are subject to tax under subchapter H and mutual insurance companies that are subject to tax under subchapter L are types of cooperatives. Respondent argues that, by expressly excluding them, section 277(b) "readily implies that all other cooperatives are within the intendment of the statute."

We disagree. The maxim expressio unius is a rule of statutory construction, not a rule of law, "and serves only as an aid in discovering the legislative intent when * * * [it] is not otherwise manifest." *United States v. Barnes,* 222 U.S. 513, 519 (1912); see 2A Sutherland Statutory Construction, sec. 47.23 (1984). In this case, as discussed above, our analysis of the statute as a whole shows that the application of section 277(a) to nonexempt cooperatives would conflict with provisions of subchapter T. Accordingly, we conclude that Congress did not intend section 277 to be applied to nonexempt cooperatives. We are not persuaded otherwise by respondent's general argument. Moreover, the premise of respondent's argument, that mutual savings banks and mutual insurance companies are organizations which fall in the same category for tax purposes as nonexempt cooperatives subject to subchapter T, is questionable. For one thing, section 1381(a)(2)(B) specifically excludes from subchapter T organizations subject to subchapter H and subchapter L. For another thing, exempt cooperatives are not subject to the unrelated business income tax, and, therefore, when Congress enacted section 277 in 1969, there was no reason for section 277 to cover nonexempt cooperatives. Both mutual savings banks and mutual insurance companies, on the other hand, had exempt section 501(c) counterparts subject to the unrelated business income tax, and there was reason to believe that they would have been subject to section 277 if they had not been specifically excepted from that provision.

Respondent's second principal argument is that the legislative history of section 277 shows that Congress intended the term "membership organization" to include nonexempt cooperatives. Respondent points to the fact that a part of the Technical Explanation of Tax Reform Act of 1969, H. Rept. 91–413 (Part 2) (1969), 1969–3 C.B. 340, 354, specifically refers to "cooperative":

New section 278 [which eventually became section 277] applies in the case of a social club, *cooperative,* or other membership organization which is not exempt from taxation and which is operated primarily to furnish services or goods to members. \* \* \* [Emphasis supplied.]

Based upon the inclusion of the word "cooperative" in the above sentence, respondent concludes that Congress intended to apply section 277 to nonexempt cooperatives.

We are not able to attach the same significance to the use of the word "cooperative" in the Technical Explanation as respondent. We note that the word does not appear in other committee reports or documents composing the legislative history of the Tax Reform Act of 1969. Part 1 of the House report, printed 2 days earlier than the Technical Explanation, makes reference to "Certain nonexempt corporations organized to provide services to members" and "social clubs, fraternal beneficiary societies, and voluntary employees' beneficiary associations", but does not mention cooperatives. See H. Rept. 91–413 (Part 1), *supra,* 1969–3 C.B. at 232. Both the Senate report and the conference report, printed later than the Technical Explanation, make no reference to "cooperatives" in describing the entities to which the section applies. See S. Rept. 91–552 (1969), 1969–3 C.B. 423, 471–472; H. Conf. Rept. 91–782 (1969), 1969–3 C.B. 644, 652–653. The General Explanation of the Tax Reform Act of 1969 (J. Comm. Print 1970), prepared by the staff of the Joint Committee on Taxation, is also silent on the possible application of section 277 to cooperatives.

Petitioner's brief makes the suggestion that inclusion of the word "cooperative" in the Technical Explanation was simply a mistake. Petitioner points out that a similar mistake was made in the House report in the list of exempt organizations which became subject to unrelated business income tax. H. Rept. 91–413, *supra,* 1969–3 C.B. at 230. Petitioner notes that the list includes a reference to "farmers' cooperatives".

*Id.* However, exempt cooperatives described in section 521 are not organizations described in sections 401(a) or 501(c) and, thus, are not subject to unrelated business income tax. Sec. 511(a)(2). Petitioner suggests that these two mistakes were corrected in the subsequent committee reports. The report of the Senate Finance Committee substituted the term "farmers' cooperatives formed to finance crop operations"; i.e., section 501(c)(16) organizations, for the term "farmers [sic] cooperatives". S. Rept. 91–552 *supra,* 1969–3 C.B. at 467.

Moreover, the legislative history of the Tax Reform Act of 1969 provides other indications that Congress did not consider section 277 to be applicable to nonexempt cooperatives. First, the Tax Reform Act of 1969 expanded to 10 years the period during which banks for cooperatives, as defined in section 2 of the Farm Credit Act of 1933, ch. 98, 48 Stat. 257, were allowed to carry back net operating losses. Tax Reform Act of 1969, Pub. L. 91–172, sec. 431(b), 83 Stat. 487, 619, formerly section 172(b)(1)(G). If section 277 applied to nonexempt cooperatives at the same time, then this amendment would have been meaningless because a bank for cooperatives could not have realized a net operating loss, as defined by section 172(c).

Second, the Senate Finance Committee removed from the House version of the Tax Reform Act of 1969 a proposed amendment to section 1388. S. Rept. 91–552, *supra,* 1969–3 C.B. at 619. In taking that action, the Senate Finance Committee called on the Treasury Department, the Senate Finance Committee staff, and the staff of the Joint Committee on Taxation to conduct a study of the extent to which cooperatives were increasingly engaged in activities that were unrelated to the purpose for which the special tax treatment of cooperatives was originally granted and to formulate a proposal to withdraw the special tax treatment of cooperatives with respect to such unrelated activities. *Id.* The conference committee on the Tax Reform Act of 1969 approved the action taken by the Senate and requested the study "be made by January 1, 1972." H. Conf. Rept. 91–782, *supra,* 1969–3 C.B. at 671. If section 277 applied to nonexempt cooperatives, it would have been unnecessary, and indeed illogical, for Congress to request a study and proposal in the case of cooperatives to deal with the problem of unrelated

activities. This was the same problem addressed by section 277.

In further support of her position that Congress intended the term "membership organization" to include nonexempt cooperatives, respondent cites the legislative history of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520. The Senate Finance Committee report states, in connection with section 1301 of the bill:

> The committee does not believe that a clarification of the rules relating to the cooperative housing corporation's ability to take depreciation deductions with respect to property leased to tenant-stockholders will create tax avoidance possibilities because the provisions of existing law (sec. 277) generally prevent nonexempt membership organizations from offsetting nonmember income with losses from dealings with members. [S. Rept. 94–938, at 398 (1976), 1976–3 C.B. (Vol. 3) 49, 436.]

Section 1301 of H.R. 10612, which became section 2101 of the Tax Reform Act of 1976, 90 Stat. 1897, 1899, enacted section 528 and amended section 216(c). It did not purport to amend or clarify section 277. Moreover, the above passage states that "nonexempt membership organizations" are subject to section 277. It does not say that nonexempt cooperatives are subject to section 277.

Respondent's third principal argument is that case law also supports the application of section 277 to nonexempt cooperatives. In that argument, respondent cites no case which, in our view, supports the application of section 277 to nonexempt cooperatives. The cases cited by respondent have been discussed above and need not be again considered here.

## Conclusion

As discussed in detail above, we find that the provisions of section 277 conflict with the provisions of subchapter T and that the application of section 277 to nonexempt cooperatives would lead to absurd or futile results. This is a strong indication that Congress did not intend section 277 to be applied to nonexempt cooperatives. We also find that the arguments advanced by respondent in support of the position that section 277 applies to nonexempt cooperatives are flawed.

Accordingly, we hold that section 277 does not apply to nonexempt cooperatives subject to tax under subchapter T and that nonexempt cooperatives are not "membership

organizations" within the meaning of section 277. Having so decided, we need not consider petitioner's argument that it is not an organization "primarily operated to furnish services or goods to members."

To reflect the foregoing,

*Decision will be entered for petitioner.*